UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                    )
LEASE CRUTCHER LEWIS WA, LLC,      )
                                                    )     Case No. C08-1862RSL
                          Plaintiff,             )
          v.                                      )
                                                    )     ORDER REGARDING CROSS-
NATIONAL UNION FIRE INSURANCE )     MOTIONS FOR SUMMARY
COMPANY OF PITTSBURGH, PA, *et al.*, )  JUDGMENT
                                                    )
                          Defendants.         )
_____)

        This matter comes before the Court on "Lease Crutcher Lewis' Motion for Partial Summary Judgment" (Dkt. # 60), "Defendant National Union Fire Insurance Company of Pittsburgh, PA's Motion for Summary Judgment" (Dkt. # 63), and "Defendant AIG Domestic Claims, Inc.'s Joinder in National Union's Motion for Summary Judgment" (Dkt. # 65). Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

## BACKGROUND

        Plaintiff Lease Crutcher Lewis WA, LLC (hereinafter "Lease Crutcher") was the general contractor on a construction project in Bellevue, Washington, known as the Tower 333 project. On November 16, 2006, a tower crane at the site collapsed, causing significant damage to adjacent sites and killing a tenant in one of the neighboring buildings. Lease Crutcher and other subcontractors and consultants on the site were sued for wrongful death and property

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT

damages arising from the tower crane collapse.  These underlying claims exceeded $20 million, and the defendants essentially conceded that they would be jointly and severally liable for whatever damages plaintiffs might ultimately prove.  Between and among the defendants, however, the general belief was that the engineering firm that designed the base of the crane, Magnusson Klemencic Associates ("MKA"), bore the greatest fault.  MKA did not have enough insurance to cover its potential liabilities:  in fact, it had only $2-3 million in uncontested insurance coverage,[1] the major part of which was a wasting policy that would be depleted as defense costs mounted.  Lease Crutcher, on the other hand, was the "deep pocket" with a $1 million general liability insurance policy issued by Arch Insurance Company and a $25 million excess liability policy issued by defendant National Union.

Lease Crutcher's potential liability to the wrongful death and property damage plaintiffs fell within National Union's coverage provisions and coverage limits.  In addition, Lease Crutcher suffered direct losses on the project as a result of the tower crane collapse, such as additional construction costs and delay penalties, exceeding $10 million.  These losses were not covered by the Arch Insurance or National Union policies, so Lease Crutcher asserted its own direct claims against MKA to recover those costs.  Lease Crutcher notified National Union of its direct claims and requested that National Union avoid taking any steps that would compromise Lease Crutcher's ability to obtain compensation for its losses.  Lease Crutcher argued that it had a right to be made whole for all of its damages before National Union could obtain contribution from the other defendants in the tower crane litigation.  When National Union did not seem receptive to its request, Lease Crutcher filed this declaratory judgment action in federal court seeking a declaration that it, rather than its insurer, had the right to pursue the MKA funds.

---

[1] MKA also tendered the claims against it to National Union, arguing that it was an additional insured on Lease Crutcher's $20 million policy under the terms of a construction contract between Lease Crutcher and the project owner.  National Union denied the tender.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                -2-

In January 2009, Lease Crutcher was able to negotiate a settlement of its direct claims whereby MKA would pay to Lease Crutcher $2.5 million from its insurers and Lease Crutcher would have National Union settle all of the tower crane claims for which Lease Crutcher and MKA were jointly and severally liable. Lease Crutcher further agreed not to pursue its claims against MKA's principals individually. National Union refused to give up its right to seek contribution from MKA for amounts paid in settling the tower crane claims. While National Union was willing to let Lease Crutcher have MKA's $2.5 million in insurance proceeds, it was not willing to protect MKA from the wrongful death and property damage claims. The deal between Lease Crutcher and MKA fell through.

Three months later, the parties participated in their third mediation in an attempt to reach a global settlement. Plaintiffs in the underlying litigation made an offer of settlement that would require $1.5 million from MKA and another $6.875 million from Lease Crutcher/National Union. In transmitting the offer to Charles Patitucci, National Union's adjuster, the mediator commented that the negotiations were getting complicated, in part because the MKA money was "already spoken for." At the time, MKA still preferred to resolve all of its potential liabilities by paying its insurance proceeds directly to Lease Crutcher in settlement of its direct claims and having National Union give up its right to seek contribution from MKA for the underlying liability claims. National Union remained unwilling to offer MKA protection.

As an alternative, MKA offered to place the $2.3 million that remained of its insurance proceeds in escrow for the joint benefit of Lease Crutcher and National Union. MKA hoped to settle all of the claims against it while giving this Court an opportunity to determine whether the insurer or the insured should control the funds. National Union refused. Instead, National Union offered to protect MKA from the wrongful death and property claims if MKA agreed to make its insurance proceeds payable as directed by National Union. MKA agreed on April 14, 2009. Lease Crutcher was not told of this agreement. When it learned that the MKA

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                -3-

funds had been committed to National Union, Lease Crutcher amended the complaint in this litigation to assert (1) bad faith and breach of fiduciary duty claims; (2) violations of the Insurance Fair Conduct Act; (3) breach of contract; (4) violations of the Consumer Protection Act; and (5) conversion claims against National Union and its adjuster, AIG Domestic Claims, Inc. Plaintiff also seeks a declaration that Lease Crutcher has a right to be made whole that is superior to any right National Union might have to recover funds from other liable parties or insurers. In June 2009, Lease Crutcher voluntarily dismissed its affirmative claims against MKA.

## DISCUSSION

**A. Bad Faith Claim**

In order to prevail on its bad faith claim, Lease Crutcher must prove a duty, breach of that duty, and damages arising from the breach. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 485 (2003). In Washington, insurers owe an enhanced obligation of fairness to their insureds which goes beyond the standard contractual duty of good faith. Safeco Ins. Co. v. Butler, 118 Wn.2d 383, 393 (1992). Although the insurer need not put the insured's interests above its own, it must at least give equal consideration to the insured's interests (Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 386 (1986)), and may not overemphasize its own interests (Coventry Assocs. v. Am. States Ins. Co., 136 Wn.2d 269, 280 (1998)). "The determinative question is [the] reasonableness of the insurer's actions in light of all the facts and circumstances of the case." Anderson v. State Farm Mut. Ins. Co., 101 Wn. App. 323, 329-30 (2000).

Lease Crutcher argues that defendants acted in bad faith when they sought to, and ultimately did, secure for themselves contributions from a joint tortfeasor before Lease Crutcher was made whole for the losses incurred as a result of the tower crane collapse. "The general rule is that, while an insurer is entitled to be reimbursed to the extent that its insured recovers payment for the same loss from a tortfeasor responsible for the damages, it can recover only the

excess which the insured has received from the wrongdoer, remaining after the insured is fully compensated." Thiringer v. Am. Motors Ins. Co., 91 Wn.2d 215, 219 (1978). The Thiringer holding is not directly on point: Lease Crutcher had not yet litigated or settled its direct claims against MKA, and one could argue that any payment made on those claims would not be for the "same loss" for which National Union provided coverage. Nevertheless, the policy judgments and legal theories underpinning the Thiringer decision support plaintiff's bad faith claim. The Washington Supreme Court recognized that an insured pays a premium for particular coverage and has a right to expect that the insurer will pay any liabilities and losses that fall within the coverage provisions. Id. at 220 and 222. The guiding principle of the Thiringer decision is that "a party suffering compensable injury is entitled to be made whole but should not be allowed to duplicate his recovery." Id. at 220. The court concluded that an insurer should not be reimbursed for payments it contractually undertook to make until the insured has had an opportunity to recoup uninsured losses from the tortfeasor (*i.e.*, until the insured has been made whole). Id. at 220 and 222.

In the case at hand, National Union accepted a premium in exchange for a promise to pay for any liabilities Lease Crutcher incurred on the Tower 333 project up to $25 million. Because the wrongful death and property damage claims totaled less than the policy limits, Lease Crutcher had a right to expect that National Union would settle or satisfy any judgment arising from the underlying claims. In order to obtain compensation for its uninsured losses at the site (including increased construction costs and delay penalties), Lease Crutcher sued the alleged tortfeasor, MKA. Had National Union waited until Lease Crutcher obtained a judgment against MKA and then claimed those funds as reimbursement for payments made to settle the wrongful death and property damage claims, its claim clearly would have been denied. First, it is not clear that any recovery from MKA would be for the "same loss" as that covered by National Union. Second, even with MKA's $2.3 million of insurance proceeds, Lease Crutcher

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT -5-

would still have uncompensated direct losses of over $7 million.  The "made whole" rule of Thiringer would preclude National Union's recovery in these circumstances.

        Instead of waiting to see whether its insured would be able to recover on its direct claims against MKA, defendants made a play for those same funds while Lease Crutcher's claims were still pending.[2]  Had defendants simply declined to grant their insured a benefit not promised in the policy, namely, the defense and indemnity of (or release of contribution claims against) MKA in the wrongful death and property damage litigation, the outcome of this analysis might be different.  But defendants did not simply reject its insured's request.  It then delayed settlement of the underlying claims against its insured, notwithstanding the fact that Lease Crutcher was jointly and severally liable for the full amount and that plaintiffs were willing to take far less than the policy limits.  The evidence in the record shows that defendants had no intention of settling the underlying claims until they had obtained control of MKA's insurance proceeds as contribution toward those liabilities.  By delaying settlement, the underlying claims against MKA remained a threat to MKA and at least one of its principals.  MKA offered to put its remaining $2.3 million into escrow for the benefit of Lease Crutcher and National Union, but National Union declined, seeking sole control over the funds.  The benefit that National Union was not willing to grant when requested by Lease Crutcher – protection for MKA from the underlying claims – was used to obtain control over the $2.3 million.  Absolutely no benefit accrued to Lease Crutcher through this maneuver:  Lease Crutcher's direct claims went uncompensated and National Union was able to reduce the amount it was required to pay plaintiffs in the wrongful death and property damage litigation.[3]

---

    [2] This fact distinguishes this case from Averill v. Farmers Ins. Co. of Wash., 155 Wn. App. 106 (2010).

    [3] Defendants' reliance on the fact that Lease Crutcher benefitted from the settlement of the underlying wrongful death and property damage claims is misplaced.  Lease Crutcher was entitled to indemnity from National Union in exchange for its policy premiums.  It did not have to "buy" the

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT          -6-

In short, the insurer sought and obtained all of a joint tortfeasor's insurance proceeds with full knowledge that its insured had uncovered and uncompensated losses and was affirmatively seeking recovery of those same funds. Despite a clear contractual obligation to pay all sums for which Lease Crutcher became liable in the tower crane litigation, National Union delayed payment so it could acquire "contributions" that it knew would reduce its liability under Lease Crutcher's policy at Lease Crutcher's expense. Defendants placed their interests above those of their insured: in fact, the evidence shows that defendants gave Lease Crutcher's interests in pursuing compensation for their uninsured losses no consideration whatsoever.[4] Given all of the facts and circumstances of this case, defendants actions were unreasonable and in bad faith.

Defendants argue that they had no duty to consider Lease Crutcher's direct losses, or the impact their actions might have on Lease Crutcher's ability to recover for those losses, because the increased construction costs and delay penalties were not liabilities covered by the National Union policy. The fiduciary duty to act in good faith is imposed by statute: "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW 48.01.030. The only reason National Union was involved in the tower crane litigation was because it had agreed to insure Lease Crutcher. All of Lease Crutcher's losses, both insured and uninsured, arose out of a single occurrence. The Court finds that National Union owed a duty of good faith in all actions related to this matter. In addition, the "made whole" doctrine does not

---

coverage again by giving up its right to compensation from MKA.

[4] During his deposition, defendants' adjuster was asked, "What considerations did you give to the interests of Lease Crutcher Lewis and its ability to recover for its affirmative claims?" Mr. Patitucci replied, "My consideration was to Lease Crutcher Lewis as a defendant and trying to honor my obligations under the policy that I have to represent that policy and handle their claim as a defendant. I do not have an obligation to them as a plaintiff." Decl. of Stephen G. Skinner (Dkt. # 88), Ex. F at 230.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT             -7-

differentiate between covered and uncovered losses: under Washington law, an insurer may not seek contribution toward its obligations unless and until the insured has been made whole for all losses arising out of the insurable event. See Sherry v. Fin. Indem. Co., 160 Wn.2d 611, 618-25 (2007); S&K Motors, Inc. v. Harco Nat. Ins. Co., 151 Wn. App. 633, 641-42 (2009).

Finally, defendants argue that their conduct did not harm Lease Crutcher because their agreement with MKA did not purport to resolve or otherwise interfere with Lease Crutcher's direct claims. The evidence shows, however, that National Union not only obtained control of MKA's uncontested insurance proceeds, but extracted a release of any claim for coverage that MKA might have against National Union as an additional insured. Thus, the only insurance monies conceivably available to MKA once it committed its $2.3 million to National Union were from USF&G, which had denied coverage and initiated a declaratory judgment action. The evidence in the record also shows that, in the absence of insurance coverage, MKA had limited ability to pay any damages awarded on the direct claims. In 2009, MKA's revenues were down 50% from the year before, it laid off 30% of its workforce, and its backlog of business was significantly reduced. More importantly, this is not a situation in which the legal validity of the insured's third-party claim or the potential recovery amount were contested. MKA was willing, and in fact wanted to, give Lease Crutcher $2.5 million to resolve the direct claims. Defendants, acting in bad faith, made sure that deal could not succeed and then took the money for themselves. For purposes of plaintiff's motion for partial summary judgment, the Court finds that plaintiff has established the fact, if not the amount, of damages.

**B. Insurance Fair Conduct Act, RCW 48.30.015**

The Insurance Fair Conduct Act ("IFCA") authorizes "first party claimant[s] to a policy of insurance who [are] unreasonably denied a claim for coverage or payment of benefits by an insurer [to] bring an action in superior court of this state to recover the actual damages sustained, together with the costs of the action, including reasonable attorneys' fees and

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT               -8-

litigation costs." RCW 48.30.015(1). Plaintiff has not alleged a denial of a claim for coverage or payment of benefits. Instead, plaintiff argues that any violation of WAC 284-30-330 constitutes a *per se* violation of IFCA. The language of the statute does not support plaintiff's argument. A violation of WAC 284-30-030 may justify the imposition of treble damages under RCW 48.30.015(2) and/or an award of fees and costs under RCW 48.30.015(3), but an underlying denial of coverage is still required. Plaintiff's IFCA claim fails as a matter of law.

**C.  Breach of Contract**[5]

National Union promised to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract . . . ." Plaintiff argues that National Union breached this promise "by failing to perform its contractual duty to settle and pay the claims against Lewis without conditioning such settlement and payment upon use of the MKA insurance funds." Motion (Dkt. # 60) at 15. No such promise is contained in the policy. Nor does the contract prohibit contribution from joint tortfeasors, at least until the time that the insured becomes "legally obligated to pay" a certain amount.

Lease Crutcher's argument appears to be that, because it had insurance coverage sufficient to pay the underlying wrongful death and property damage claims in their entirety, any pre-payment contribution from a joint tortfeasor automatically breaches the insurer's promise to pay. If accepted, plaintiff's argument would preclude negotiated settlements of an underlying liability and would necessitate subsequent contribution actions. A global settlement that establishes each tortfeasor's *pro rata* contribution in the underlying litigation is efficient for both the parties and the judicial system. The insureds obtain the promised indemnification from liability, the insurers pay an equitable share based on their insured's culpability, and neither the

---

[5] The breach of contract claim against defendant AIG Domestic Claims was dismissed on October 20, 2009.

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT             -9-

insurers nor the judiciary are burdened with separate litigation to allocate the payments between and among the joint tortfeasors. Plaintiff's argument would invalidate an efficient and common claims handling procedure with no clear contractual mandate. Neither the language of the insurance contract nor the policy considerations underlying Thiringer and other Washington case law supports plaintiff's breach of contract claim.

**D. Consumer Protection Act, RCW 19.86** *et seq*.

The Washington Consumer Protection Act ("CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. A private cause of action exists under the CPA if (1) the conduct is unfair or deceptive, (2) occurs in trade or commerce, (3) affects the public interest, and (4) causes injury (5) to plaintiff's business or property. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780 (1986). For purposes of the first element, a *per se* unfair trade practice exists when a statute has been violated and the legislature has declared such violation an unfair or deceptive act in trade or commerce. Villella v. Pub. Employees Mut. Ins. Co., 106 Wn.2d 806, 820 (1986).

An insurer's breach of its duty of good faith generally constitutes a *per se* violation of the CPA. Gingrich v. Unigard Sec. Ins. Co., 57 Wn. App. 424, 433 (1990).[6] The conduct is unfair, it occurs in trade or commerce, and the legislature has declared that it affects the public interest.[7] Plaintiff has also shown that it was injured in its business as a result of defendants' bad faith. It has therefore established defendants' liability under the CPA.

**E. Conversion**

Defendants seek summary dismissal of plaintiff's common law claim of

---

[6] Because both National Union and AIG Domestic Claims violated their duties of good faith, the Court need not determine whether National Union also violated WAC 284-30-330(6) and/or (12).

[7] RCW 48.01.030 ("The business of insurance is one affected by the public interest . . .").

ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT                -10-

conversion. The tort of conversion is "the act of wilfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." Judkins v. Sadler-MacNeil, 61 Wn.2d 1, 3 (1962). Although the tort generally involves the loss of property, money may be the subject of a conversion claim if defendants "wrongfully received" the money or were under an obligation to return the specific money at issue to the party claiming it. Davenport v. Wash. Educ. Ass'n, 147 Wn. App. 704, 721-22 (2008). At the time of the alleged conversion, plaintiff must have a possessory or other property interest in the funds, and defendant's interference with that interest must be without lawful justification.

In the circumstances presented here, plaintiff had a superior interest to the funds as against its insured, but it did not have a possessory interest at the time of the alleged conversion. Plaintiff's conversion claim fails as a matter of law.

**F.  Declaratory Judgment**

Neither Lease Crutcher nor National Union has argued the merits of plaintiff's declaratory judgment action. Plaintiff has not asserted a claim for declaratory relief against AIG Domestic Claims.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for summary judgment is GRANTED as to its bad faith and Consumer Protection Act claims. Defendants are liable under those claims, and damages will be ascertained at trial. Defendants' motions for summary judgment are GRANTED as to plaintiff's breach of contract, Insurance Fair Conduct Act, and conversion claims. The claim for declaratory relief remains unresolved.

Dated this 15th day of October, 2010.

Robert S. Lasnik
United States District Judge